IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| vs. : | CRIMINAL NO. 09-256-1 |
| JOHNNY COBB, : Defendant. | |

FILED

NOV 12 2009

MICHAEL E. KUNZ, Clerk
_____ Dep. Clerk

**MOTION TO SUPPRESS EVIDENCE**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

RUFE, J.                            November 12, 2009

The Indictment in the above-captioned case charges Defendant Johnny Cobb ("Defendant" or "Cobb") with twenty-three (23) counts, including allegations of conspiracy, the use of a counterfeit access device, the attempt to use a counterfeit access device, the use of an unauthorized access device, aggravated identity theft, and the possession of fifteen (15) or more counterfeit or unauthorized devices.[1] Defendant has filed a Motion to Suppress all physical evidence recovered in connection with his arrest on March 12, 2009.[2] Upon consideration of Defendant's Motion, an evidentiary hearing and oral argument held thereon,[3] and resulting briefs from both parties,[4] the Court enters the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

1.  At approximately 4 P.M. on March 12, 2009, Officers Bednar ("Bednar") and Burkett

---

[1] Doc. No. 1.

[2] Doc. No. 46.

[3] See Doc. No. 65 (Transcript of suppression hearing held on July 10, 2009 ("Tr.")).

[4] Doc. Nos. 64, 67.

-1-

("Burkett") of the Upper Merion Township Police Department responded to King of Prussia Mall ("Mall") on a police dispatch report of possible credit card fraud. The officers were in uniform, and they traveled in separate patrol vehicles.[5]

2. Officers Bednar and Burkett were accustomed to responding to reports from Loss Prevention Officers, including many initiated by employees located at the Mall.[6]

3. The dispatch reporting the incident to which Bednar and Burkett responded stated that a Bloomingdale's employee observed a man attempt to purchase an expensive Fendi handbag using multiple credit cards.[7] After the customer's first two cards were denied, he then used a third card to successfully complete the purchase. He showed the employee a New York state identification card. The Bloomingdale's store at the Mall had recently been experiencing problems with individuals presenting New York identification cards attempting to purchase expensive handbags with fraudulent credit cards.[8]

4. When Bednar and Burkett arrived at the Mall, they met with Richard Verna ("Verna"), a Loss Prevention Officer at the Bloomingdale's store, to discuss the alleged incident. Bednar learned that Verna had followed the suspect from the Court area of the Mall through a crosswalk into the Plaza area, while two other males accompanying the suspect had entered a green Ford Explorer with New York state registration.[9] All three male suspects were

---

[5]Tr. at 31:18-20, 61:11-13.

[6]Tr. at 4:22-25, 5:1-8, 41:21-25, 42:1-9.

[7]Tr. at 5:20-24, 7:4-19.

[8]Gov.'s Resp. to Def.'s Mot. to Suppress 2.

[9]Tr. at 6:17-24, 8:9-13.

African-American.

5. Bednar relayed Verna's comments to Burkett, who acted as backup officer on the call.[10] Burkett then broadcast the vehicle description via police radio.[11]

6. Corporal Brazunas ("Brazunas"), also with the Upper Merion Township Police Department, heard the report of suspicious activity at Bloomingdale's while on another call and drove over to Mall. When he reached the Mall parking lot, Brazunas called Burkett who gave him a description of the vehicle allegedly involved in the incident.[12]

7. Shortly thereafter, Brazunas observed a green SUV with New York tags driving within the Mall area (on a roadway identified at the evidentiary hearing as the "ring road").[13] He called in the tag number of the vehicle and received confirmation that it matched the number given out by Bloomingdale's security.[14] The time period between Brazunas hearing the initial police dispatch and spotting of the vehicle was approximately five or six minutes.[15]

8. Brazunas then followed the vehicle, which he identified as a Ford Expedition, until he could pull the car over safely on the ramp leading to 76 West. Seeing that the vehicle windows were heavily tinted, Brazunas waited for Bednar and Burkett to arrive so that another officer would be present when he made contact with the occupants.[16]

---

[10] Tr. at 43:15-16, 44:9-24.

[11] Tr. at 44:24-25, 45:1-2.

[12] Tr. at 15:15-18.

[13] Tr. at 16:21-25, 17:1-9.

[14] Tr. at 18:2-20.

[15] Tr. at 15:15-21.

[16] Tr. at 21:1-17.

9. Brazunas approached the vehicle on the driver's side while Bednar and Burkett approached on the passenger side. Both Brazunas and Burkett noticed the rear passenger moving around through the window.[17]

10. Brazunas walked up to the driver's side window and began conversing with Johnny Cobb, the driver of the vehicle, informing him of their investigation and asking for identification and registration.

11. Burkett, seeing movement by the backseat passenger, opened the door. He noticed the passenger's right hand down by his feet.[18] Burkett then grabbed the man, later identified as Jerrod Abney ("Abney"), and ordered him to step outside the vehicle.[19]

12. During these activities, and only a few minutes after the stop, three additional police officers, Detective Gershanick ("Gershanick"), and Special Agent Adam Tierney from the Secret Service arrived at the scene to help with the investigation. Gershanick, assigned to the Detective Division in the Economic Crimes Unit specializing in financial crimes, had been trained to identify counterfeit credit cards.[20]

13. Burkett led Abney to the rear of the Expedition and patted him down. While performing the pat-down, he felt something in Abney's sock that he believed to be a credit card.[21] Burkett questioned Abney regarding the object; Abney replied that it was his identification and gave

---

[17] Tr. at 21:1-2, 47:12-16.

[18] Tr. at 47:12-19.

[19] Tr. at 47:19-22, 80:3.

[20] Tr. at 74:23-25, 75:1-16.

[21] Tr. at 48:2-5.

Burkett permission to pull it out and look at it.[22]

14. Burkett retrieved Abney's New York identification and two credit cards from the sock. He handed the credit cards to Gershanick, who quickly determined that the cards were counterfeit.[23] Abney was placed under arrest at that time.

15. Following Abney's arrest, Gershanick frisked the front seat passenger, identified as Terrell Dobson ("Dobson"). More cards believed to be counterfeit were discovered in several locations on his person, and Dobson was arrested as a result.

16. Seeing that the two passengers were removed from the vehicle by the other officers, Brazunas asked Cobb to do the same, citing safety concerns.[24] Officer Hiller performed a pat-down of Cobb after he exited the car.[25]

17. Gershanick asked for Cobb's consent to search the vehicle, to which he replied, "Yeah, go ahead."[26] Gershanick then directed Burkett to search the car.[27]

18. While Burkett was searching the car, Gershanick performed a second pat-down of Cobb.[28] In doing so, Gershanick felt an object in Cobb's upper right shirt pocket that he believed to be a receipt connected to the recent use of the counterfeit credit cards.[29] Gershanick removed

---

[22] Tr. at 48:6-7.

[23] Tr. at 50:10-13, 80:2-6.

[24] Tr. at 29:15-25, 30:1-2.

[25] Tr. at 31:5-7.

[26] Tr. at 82:12-18.

[27] Tr. at 55:4-6.

[28] Tr. at 82:17-20.

[29] Tr. at 83:20-23.

the piece of paper from Cobb's pocket and recognized it as a receipt.[30] The receipt recorded the purchase of a Sony Playstation 3 game console from a Gamestop store.[31]

19. In searching the Expedition, Burkett discovered three additional credit cards later determined to be counterfeit. The last four numbers on one of the cards matched the last four numbers on the receipt found in Cobb's shirt pocket.[32]

20. Based on the evidence recovered at the scene, Cobb was placed under arrest.

## II. DISCUSSION OF APPLICABLE LAW

Cobb asserts several arguments for why the evidence gathered on March 12, 2009 should be excluded. First, he alleges his Fourth Amendment rights were violated when Corporal Brazunas performed the traffic stop because there was no reasonable suspicion that a crime had been committed. Second, Cobb challenges the pat-downs of the three occupants of the vehicle, in particular his own, on the basis of a lack of belief that law enforcement had safety concerns or the requisite level of cause. Finally, Cobb argues that the alleged consent given to search the car was not given voluntarily. Throughout Cobb's Motion to Suppress are accusations that law enforcement acted unlawfully based upon racial bias towards Cobb and the other two occupants of the vehicle. The burden is on the Government to prove by a preponderance of the evidence that any warrantless search or seizure that occurred was lawful,[33] and that any consent given to search was voluntary.[34]

---

[30] Tr. at 83:23-24.

[31] Tr. at 82:20-23.

[32] Tr. at 84:12-18.

[33] See United States v. Morales, 861 F. 2d 396, 399 (3d Cir. 1988).

[34] See United States v. Matlock, 415 U.S. 164, 177-78, n.14 (1974).

### A. Law enforcement had reasonable suspicion justifying the seizure of the vehicle containing Cobb and others.

Cobb claims that the allegedly unlawful stop led directly to the discovery of the evidence at issue, and because it was obtained as a direct result of an unlawful seizure, the Court should suppress the evidence found by law enforcement on March 12, 2009 under the "fruit of the poisonous tree" doctrine.[35] The stop by Brazunas was largely based on the information provided by Bloomingdale's employees at the King of Prussia Mall, and in particular, the description of a car that the suspects entered upon leaving. To evaluate whether the requisite level of reasonable suspicion was achieved by the information available to law enforcement, the Court looks to the Fourth Amendment of the Constitution.

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures."[36] Significantly, the warrant requirement acts as protection against Fourth Amendment violations by law enforcement. At issue in the present matter is one of the exceptions to the warrant requirement in which "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot" ("Terry stop").[37] The level of suspicion required by Terry is less than the probable cause standard and need not be supported by a preponderance of the evidence,[38] but the

---

[35] See Wong Sun v. United States, 371 U.S. 471 (1963).

[36] U.S. Const. amend. IV.

[37] Illinois v. Wardlow, 528 U.S. 119, 123 (2000).

[38] Id.

officer must have a "'particularized and objective basis' for suspecting legal wrongdoing"[39] and it must be more than a mere "hunch."[40] Law enforcement expertise and training can be a factor in the analysis.[41] A court evaluates the objective basis for a stop in light of the totality of the circumstances surrounding it.[42]

The Court begins its Terry analysis by evaluating the information provided by Bloomingdale's employees, relayed through officer communication, that led to the stop. Where the primary basis for a Terry stop is an informant's report or "tip", a Court must look to the 'veracity,' 'reliability,' and 'basis of knowledge' of that individual.[43] The Third Circuit, reviewing multiple cases involving tips received in a variety of different circumstances, has established generally that:

> [t]he following specific aspects of tips indicate reliability:
>
> (1) The tip information was relayed from the informant to the officer in a face-to-face interaction such that the officer had an opportunity to appraise the witness's credibility through observation.
>
> (2) The person providing the tip can be held responsible if her allegations turn out to be fabricated.
>
> (3) The content of the tip is not information that would be available to any observer. A not truly anonymous tip is accorded greater weight when the specific details of language, type of activity and location matched a pattern of criminal activity known to the police, but not the general public, and the tip could not have been generated by the general public, nor based solely on observation.

---

[39]United States v. Arvizu, 534 U.S. 266, 273 (2002) (referencing United States v. Cortez, 449 U.S. 411, 417-18 (1981)).

[40]Terry v. Ohio, 392 U.S. 1, 27 (1968).

[41]Supra, note 39.

[42] United States v. Nelson, 284 F.3d 472, 477-78 (3d Cir. 2002); Sharrar v. Felsing, 128 F.3d 810, 818 (3d Cir. 1997).

[43]Illinois v. Gates, 462 U.S. 213, 230 (1983).

> (4) The person providing the information has recently witnessed the alleged criminal activity.
>
> (5) The tip predicts what will follow, as this provides police the means to test the informant's knowledge or credibility. Predictive information is also useful in that it can reflect particularized knowledge.[44]

In the instant matter, the police received all information later used to identify and target Defendant's vehicle from Loss Prevention Officer Verna and another Bloomingdale's employee. Reliability aspect (1) above is satisfied by the face-to-face meeting that Officers Bednar and Burkett experienced with Verna. As indicated in aspect (2), known informants' tips are given more weight than tips from anonymous informants because the individuals reporting are subject to adverse consequences from false complaints,[45] which is the case in the present matter. Also, Verna's position as a Loss Prevention Officer lends significant credence to the fact that his report was based on his experience and interest in detecting suspicious behavior at Bloomingdale's. Aspect (4) of the above list also supports the reliability of the tip in this case, because the initial report came directly from a Bloomingdale's employee who witnessed the suspicious activity, and the description of the suspect and the vehicle came directly from Verna. The Court is aware of no reason for the officers to doubt the veracity or basis of knowledge of either the salesperson from Bloomingdale's or Verna's later observations. Additionally, there is no evidence in the record to suggest that the Bloomingdale's employees' report was racially biased, or that they were making accusations in bad faith, as Cobb alleges. Thus, on the facts available, the Court finds the tip to be reliable, truthful, and based in the knowledge of the reporting informants.

---

[44] United States v. Brown, 448 F.3d 239, 249-50 (3d Cir. 2006) (citations omitted).

[45] See, e.g., United States v. Johnson, 95 Fed. Appx. 448, 450-51 (3d Cir. 2004) (discussing the facts of Adams v. Williams, 407 U.S. 143).

Regarding the nature of the report to which the officers responded, the Court focuses next on the content of the report to determine whether it "provide[d] a particularized and objective basis for suspecting the particular person stopped of criminal activity."[46] Verna's description of the car was that it was a green Ford Explorer with New York tags, and he took note of the specific tag number. Corporal Brazunas used this information alone (notably, not the race of the occupants) to identify and pull over the vehicle in this case. The only discrepancy regarding the description involves the difference between the model reported (Explorer) and the model of the car stopped by Brazunas (Expedition). However, this discrepancy does not substantially diminish the basis for suspicion created by the location of the vehicle, the short time period between the dispatch and the sighting of said vehicle, the similarity between the car described and the car spotted notwithstanding the model, and the match of the tag number. These factors, taken together, provide ample evidence to conclude that the vehicle stopped was the one connected to the suspicious activity at Bloomingdale's.

Considering the foregoing factors as applicable to this case, the Court agrees with the Government that the information gathered from Verna and the other Bloomingdale's employees supplied Brazunas and the other officers with a proper basis for the initial stop. Accordingly, the Court concludes that the initial stop in question was lawful because it was supported by reasonable suspicion.

---

[46] United States v. Goodrich, 450 F.3d 552, 560 (3d Cir. 2006) (citing Florida v. J.L., 529 U.S. 266, 272 (2000)).

**B. Cobb does not have standing to challenge the search of the other occupants of the vehicle, and the two pat-down searches of Cobb did not violate the Fourth Amendment.**

Cobb's second argument relates to the events immediately after the vehicle was stopped. Specifically, he again invokes the "fruit of the poisonous tree"[47] doctrine again to suggest that the evidence found on his person, a receipt, should be suppressed due to alleged Fourth Amendment violations that occurred prior to and during the pat-down. Under this doctrine, the government is prohibited from using direct or indirect evidence against someone when that evidence is seized during an unlawful search.[48]

The Court rejects this argument by recognizing that Cobb lacks standing to challenge the searches of Abney and Dobson, the other two occupants of the vehicle. It is well settled that an individual has standing only to challenge a search when that person has a legitimate expectation of privacy in the place being searched.[49] This applies to all searches conducted by law enforcement, and the rule applies in the "fruit of the poisonous tree" context.[50] In this case, police discovered evidence during pat-downs of Abney and Dobson, pat-downs that Defendant claims were not justified under the law. Cobb does not have an objectively reasonable expectation of privacy with respect to the pat-downs of the other occupants of the vehicle he was driving. Even if the searches violated the Fourth Amendment (which the Court need not address), he cannot invoke the

---

[47]Supra, note 35.

[48]Id. at 484.

[49]United States v. Lampkins, 811 F. Supp. 164, 168 (1993) (citing Rakas v. Illinois, 439 U.S. 128, 143 (1978)). The "expectation of privacy" two-part test arises from Justice Harlan's concurrence in Katz v. United States. 389 U.S. 347, 360-62 (1967). The two requirements are "first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" Id.

[50]See, e.g., United States v. Smith, 282 Fed. Appx. 143, 147 (2008).

exclusionary rule regarding the evidence recovered. With this question resolved, the Court turns to whether the searches of Cobb, and Cobb alone, are supported by adequate justification.

A search is unreasonable if it is conducted without adequate justification; depending on the circumstances and the scope of the search, either reasonable suspicion or probable cause is required. Cobb asserts that the proper level of justification did not exist for two searches of his person conducted by law enforcement at two separate points in time during the traffic stop: the first was a pat-down for weapons by Officer Hiller, and the second occurred after the discovery of evidence on the persons of Abney and Dobson. The Court addresses the two searches in chronological order.

The Fourth Amendment represents a balance between an individual's right to personal security and the public interest. Reasonable searches and seizures are situations in which courts have decided the balance favors some limited invasion of personal security. The Supreme Court in Terry, and then Mimms (which applied Terry to the traffic stop context) made such a determination when it stated that officer safety can excuse pat-down searches if the officer has reason to believe that the individual is armed and dangerous.[51] It is an objective standard: the action must be reasonable to the particular officer given the relevant facts.[52] In the present matter, the first search occurred when Officer Hiller patted Cobb down shortly after he was asked to step out of the SUV. The backseat passenger, Abney, had been moving about the car seat as the officers approached the vehicle, causing Burkett to suspect he might be holding or hiding a weapon. Burkett, therefore, removed Abney from

---

[51]See supra, note 40; Pennsylvania v. Mimms, 434 U.S. 106 (1977). Officers, by the same reasoning, can ask an occupant of a vehicle to get out of the car during a traffic stop. Mimms, at 111.

[52]Supra, note 40, at 21-22.

the vehicle. Brazunas noted that once one occupant had been removed for safety reasons, both of the other occupants also were subject to the same level of suspicion, which was addressed by removing them from the vehicle and conducting pat-down searches of each occupant.

Immediately after Cobb exited the vehicle at Brazunas' request, Hiller performed a pat-down of Cobb. The Court finds under these circumstances that Hiller had an objectively reasonable basis for patting Cobb down for officer safety. Although the Court is not aware of any evidence recovered as a direct result from Officer Hiller's pat-down, it notes that Hiller's pat-down clears the standard required by the Fourth Amendment.

If law enforcement has probable cause to search an individual, the search need not be limited to a pat-down for officer safety. The second pat-down search of Cobb occurred after Detective Gershanick discovered counterfeit credit cards on the persons of the other two occupants of the SUV. At this time the level of suspicion had risen to probable cause, meaning that "the facts and circumstances within [officers'] knowledge and of which [officers] had reasonably trustworthy information were sufficient in themselves to warrant a man of reasonable caution in the belief" that evidence of illegality could be found on the occupants of the vehicle.[53] During this search, Gershanick reached into Cobb's right shirt pocket after detecting what might be a receipt inside. This was not constitutionally problematic, because Gershanick could search for evidence of illegal activity, not just weapons. The Court concludes that Detective Gershanick had probable cause to search Cobb after the discovery of contraband on the persons of the other two occupants of the vehicle.

---

[53] Carroll v. United States, 267 U.S. 132, 162 (1925).

**C. Cobb's consent was voluntarily given, and officers could search the vehicle because they had probable cause to believe there would be contraband inside.**

Finally, Cobb maintains that the alleged consent he gave to search the car was not voluntary, and thus the evidence retrieved in the car search should be excluded under the Fourth Amendment. A search based on voluntarily given consent is not subject to the warrant requirement of the Fourth Amendment.[54] In determining whether consent for a warrantless search is voluntary, a court must look at the totality of the circumstances.[55] Both Officer Burkett and Detective Gershanick provided credible corroborating testimony during the suppression hearing regarding the circumstances of Cobb's consent. Cobb was standing outside of the vehicle, speaking with Detective Gershanick, at the time he stated "Yeah, go ahead" in reference to the vehicle search. Several other officers were at the scene, but Cobb was not restrained or cuffed. There is no evidence offered by Cobb that suggests that he was manipulated into giving consent, lacked the education or capacity to consent, or that his free will had been affected by his surroundings.[56] Thus, the Court concludes Cobb's consent to search the vehicle was given knowingly and voluntarily.

Regardless of whether the Court finds that Cobb gave voluntary consent or not, we agree with the Government that there was independent probable cause to search the vehicle at that point in the investigation. Just as the officers at the scene had probable cause to believe that Cobb had contraband on his person, so could they reasonably believe that contraband was in the car.[57] If

---

[54]Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).

[55]United States v. Kim, 27 F.3d 947, 955 (3d Cir.1994).

[56]United States v. Antoon, 933 F.2d 200, 203-04 (3d Cir. 1991) (citing Schneckloth, supra note 54, at 225).

[57]See Wyoming v. Houghton, 526 U.S. 295, 300 (1999) (stating that car searches are constitutionally reasonable when there is probable cause to believe contraband is inside). See also Chambers v. Maroney, 399 U.S. 42, 51 (1970) (explaining that a search warrant is unnecessary in traffic stop situations in which there is probable

law enforcement has probable cause to conduct a search, the search is constitutionally reasonable. Also, law enforcement can conduct a search incident to arrest based on the arrest of the two passengers, Abney and Dobson, based on their belief that more evidence related to the arrests could be found in the vehicle.[58] The owner or driver of a car does not have a protected privacy interest in the car when a search is initiated based upon a search incident to arrest of a passenger; Fourth Amendment rights are not implicated, and the evidence retrieved can be used against either the owner/driver or the passenger.[59] Therefore, Defendant's arguments fail regarding the exclusion of any items uncovered in the March 12, 2009 traffic stop and investigation.

### III. CONCLUSIONS OF LAW

1. The information provided by Loss Prevention Officer Richard Verna and other Bloomingdale's employees was sufficiently reliable to provide a basis for a Terry stop.

2. Relying on the information provided, Corporal Brazunas' decision to seize the vehicle, and therefore the Defendant, was supported by reasonable suspicion and did not violate the Fourth Amendment.

3. Cobb does not have standing to challenge the pat-down searches of Abney or Dobson, as he did not have a reasonable expectation of privacy.

4. Officer Hiller's pat-down search of Cobb was appropriate under Terry and Mimms to ensure officer safety.

---

cause).

[58] See Arizona v. Gant, 129 S. Ct. 1710, 1714 (2009).

[59] Johnson v. Anhorn, 416 F. Supp. 2d 338, 371-72 (D. Pa. 2006).

5. Detective Gershanick had probable cause to believe that evidence of illegal activity could be found on Cobb's person, and thus his pat-down search was reasonable.

6. Officer Burkett could search the vehicle because two of the occupants had been arrested and police had probable cause to believe that there was contraband inside.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress Physical Evidence will be **DENIED**. An appropriate Order follows.